Argued July 2, reversed and suit dismissed July 29, rehearing denied September 9, 1919.

## HOUCK *v.* HOUCK.*

(183 Pac. 3.)

**Deeds—Delivery—Evidence.**

1. In suit by a son against his mother and the other children of her and the deceased father to recover the home farm claimed to have been deeded to him in consideration of his agreement to support his parents, evidence *held* to show that it was not the purpose of the parents at the time of the alleged transaction to deliver their deed to the son or part with title to the property.

**Deeds—Delivery.**

2. Delivery of a deed, to be valid, must be such as deprives the grantor of the possession and control of the instrument.

**Deeds—Delivery—Burden of Proof.**

3. In suit by a son against his mother and the other children of her and her deceased husband to recover the home farm claimed to have been deeded to him in consideration of his agreement to support his parents, the burden to prove delivery of the deed to the son was upon him.

**Deeds—Delivery—Intention.**

4. In the absence of intention on the part of parents to deliver to their son a deed to the home farm in consideration of his agreement to support them, there was no delivery of the deed.

[As to delivery of deed as question of law or fact, see note in Ann. Cas. 1914D, 108.]

From Josephine: FRANK M. CALKINS, Judge.

Department 2.

The plaintiff is a son of David Houck, now deceased, and Hilla A. C. Houck, who in April, 1907, were the

---

*The question of intention of grantor necessary to delivery of deed is discussed in a note in 12 **L. R. A.** 173.          REPORTER.

owners of a portion of the John Thomas and Norman Patterson donation land claim situate in Josephine County, embracing 187.23 acres. The defendants are the surviving widow of David Houck and the sons and daughters of David and Hilla A. C. Houck.

The plaintiff alleges that in April, 1907, for a valuable consideration, David and Hilla A. C. Houck conveyed to him ''the said property and premises by warranty deed containing general covenants of warranty, and the plaintiff thereupon entered upon said premises and took possession of the same and ever since has been and still is the owner thereof in fee simple and in possession thereof''; and:

''Plaintiff further alleges, that he failed to cause said deed to be recorded, but retained the same awaiting a convenient time for transmitting the same to the recording officer of said county, and that subsequently the defendant, Hilla A. C. Houck, or some of the other defendants herein, wrongfully and unlawfully, and without right or authority so to do, destroyed said deed, and by reason thereof the plaintiff has been deprived of his muniment of title to said lands, and is unable to complete his record title of the same.''

It is then averred that subsequent to the execution of the deed David Houck died; that the plaintiff and the defendants are his only heirs and that the latter dispute the plaintiff's title and claim that he has no right in the property, although he is the owner in fee simple. He prays that he be decreed such owner and entitled to possession of the premises.

All of the defendants except George Houck filed a joint answer, in which it is admitted that in April, 1907, Hilla A. C. Houck and David Houck were the owners of the premises in controversy, but they deny the execution of the deed to the plaintiff, that the lat-

ter ever had possession of the deed, that it was ever destroyed or that the plaintiff ever had or now has any interest in the premises except as an heir of David Houck, deceased.

For a first further and separate answer it is alleged that in 1903, as the result of illness and debility from old age, David Houck became demented and of feeble mind, which affliction continued to grow and was in progress up to the time of his death on May 13, 1908; that during this period his faculties were so impaired as to render him wholly irresponsible to care for himself, to transact any business or execute any deed or contract; that he was a constant care and burden to his wife and that at the time of his death he was seventy-seven years of age and his wife was more than seventy years old. It is further alleged that by reason of the mental and physical condition of his parents and the inducements and promises of the plaintiff, the defendant Hilla A. C. Houck, in April, 1907, entered into a contract with him by which he promised and agreed to care for his father and mother during the remainder of their lifetime and furnish all their necessities and comforts, to pay the taxes, keep up the improvements and cultivate the premises in a prudent manner, in consideration of which Hilla A. C. Houck agreed with the plaintiff that upon her death he should have an undivided half interest in the premises; that he should have possession thereof for his own use, and of the personal property thereon, until her death, and that such half interest was of the reasonable value of $5,000 to $10,000 and of the rental value of $100 per annum.

It is averred that soon after the execution of the contract the plaintiff began a system of neglect and disregard and pursued an unnatural course of con-

duct toward his parents; that he left the State of Oregon and was absent for a period of about six months; that the premises were left entirely in charge of his mother, in violation of the contract; that the plaintiff knew David Houck required constant care, nursing and attention; that after the latter's death he continued to violate his agreement and failed and neglected to provide or care for his mother, leaving her entirely to her own resources and the charity of her other children; that he failed to pay the funeral expenses or provide a monument for his father; that such expenses were paid by his mother out of the money which she received as the pension of her deceased husband, and that by reason of such mistreatment and neglect, Hilla A. C. Houck left the premises in 1910, in order to regain her health, and strength, and lived with her other children for about one year. It is alleged that upon her return in 1911 she was ill and unable to work, and on account of the continued neglect by the plaintiff in violation of his contract, and for her comfort and protection, she finally left the plaintiff, since which time she has resided with her other children, and that by the acts of the plaintiff she is fully discharged and relieved from carrying out the provisions of the contract.

For a second further and separate answer the defendants aver that between the years 1908 and 1916, inclusive, the plaintiff had the exclusive use of the disputed property and that the reasonable rental value thereof is $100 per annum; and that Hilla A. C. Houck is the duly appointed, qualified and acting administratrix of the estate of David Houck, deceased, wherefore defendants pray for an accounting for the rental value of the premises and judgment for that amount.

As a reply the plaintiff admits that he entered into a contract with Hilla A. C. Houck and David Houck during the latter's life, in April, 1907, wherein he agreed to care and provide for them and to furnish them with necessities during their lifetime, and that he has been in possession of the premises during the years 1908 to 1916, "except up to and including 1910, when the premises were being operated by a lessee." He further admits that there has never been an accounting, but denies all other material allegations.

The trial court made findings sustaining the allegations of the complaint and to the effect that while the deed and contract were in the custody and possession of the defendant Hilla A. C. Houck she destroyed them without the knowledge or consent of the plaintiff; that upon the service of the summons in this suit, and without just cause, she left the premises where the plaintiff resides and has refused and still refuses to accept maintenance and support furnished by the plaintiff under the provisions of the contract; that such acts on her part were without just cause; that the defendants knew of the execution of the deed and contract and that they had never made any objection to the manner of performing the agreement prior to the filing of the answer in this suit. Upon such findings the court made conclusions of law and based thereon rendered a decree in favor of the plaintiff, from which the defendants appeal, assigning ten alleged errors.

REVERSED AND SUIT DISMISSED.

For appellants there was a brief with oral arguments by *Mr. George W. Colvig* and *Mr. Fred A. Williams.*

For respondent there was a brief and an oral argument by *Mr. H. D. Norton.*

JOHNS, J.—The plaintiff claims that in April, 1907, his father and mother executed to him a warranty deed by which they conveyed the premises in dispute; that he then became, ever since has been and now is the owner thereof in fee simple and that he then took and has ever since retained possession. The defendants specifically deny each of these contentions.

The complaint is silent as to any contract between the plaintiff and his parents. The defendants allege the execution of a contract between the plaintiff and the defendant Hilla A. C. Houck only, by which the plaintiff agreed to care and provide for both of his parents during their lifetime, in consideration of which the mother promised to convey to him her undivided half interest in the property effective upon her death, pending which he was to have the use and possession of the premises. The reply "admits that the plaintiff and the defendant Hilla A. C. Houck and her said husband while living entered into a contract on or about April, 1907, wherein the plaintiff agreed to care and provide for the said Hilla A. C. Houck and her husband during their lifetime."

The land was free of any encumbrance and had a reasonable value of from $10,000 to $12,000. The liabilities of the parents, if any, did not exceed $200. At the time of the alleged transaction the son George had a five-year lease of the premises, which he took in 1906, holding the property until 1910 at an agreed annual rental of $100.

David Houck was a Grand Army man, receiving a government pension. He was about seventy-seven years old and his wife was past seventy. Their life was simple and their wants were few. The mother was then able to attend to her household duties and

was well and active for one of her age. The father was more or less helpless and in need of care and attention.

After some correspondence between them, the plaintiff, who was then twenty-six years old, returned from Nevada, where he was working in the mines, to the home of his parents. Within five days after he came back he went to Kerby and employed J. H. Austin, an attorney, to come to the family home and prepare some papers. For that purpose the attorney brought with him his wife, Isabel Austin, who acted as his clerk, and a typewriter. After some conversation with the old folks, from whom a description of the property was obtained, Isabel Austin, under the direction of J. H. Austin, prepared a deed to the land in question, using a blank form, and in connection therewith, as a part of the transaction, in consideration of the deed a contract was prepared by which the plaintiff was to take care of and provide for his parents for the remainder of their lives. Before the execution, the agreement was read over to David Houck and the deed and contract were then duly executed by the respective parties.

Many other points are raised, but the vital question is as to whether the papers were then actually delivered and whether the contract was executed or executory. The plaintiff claims that at the time of the execution of the papers his father and mother, the Attorney Austin, Mrs. Austin, Cy Ducommun and himself were present and that Ducommun and Mrs. Austin acted as witnesses. This transaction took place about April 25, 1907, and the consideration in the deed was one dollar. Concerning the disposal of the papers, the plaintiff testified as follows:

"Q. What was done with the deed upon its being executed by the parties?

"A. It was turned over to me and I gave it to my mother to keep.

"Q. Was it—you say it was turned over to you, explain what was done in the way of turning it over to you.

"A. Well, after it was all drawed up, signed, it was handed to me.

"Q. Into your hands?

"A. Yes.

"Q. How long did you keep it in your personal custody?

"A. Well, it was—I gave it to my mother to put with the other papers, she always kept all of the papers.

"Q. What was the purpose in giving it to your mother, what was the arrangement, if any, about that?

"A. Well, for safekeeping, I suppose.

"Q. Was there anything said about recording it?

"A. Yes, she said now to have that put on record.

"Q. Who said that?

"A. My mother, right there.

"Q. What did you say?

"A. Well, I don't remember just the words I said, now.

"Q. Did you put it on record?

"A. No, I didn't.

"Q. Why not?

"A. I just neglected it.

"Q. I understand you to say that there was a contract also drawn.

"A. Yes, sir. * * Yes, there was a contract separate from the deed.

"Q. Who signed the instrument?

"A. My father and mother and myself.

"Q. What was done with that instrument when it was signed up?

"A. That was just pinned to the deed.

"Q. Now have you ever seen those instruments since they were left with your mother for safekeeping?

"A. No, I have not.

"Q. Do you know what became of them afterwards?

"A. Only through hearsay, I heard they was burned up.

"Q. When did you first learn that this deed had been destroyed?

"A. About 1913.

"Q. Did you try to get the papers afterwards for recording?

"A. No.

"Q. What did this contract provide that you should do in the way of maintenance and support?

"A. It just stated I was to take care of my father and mother, their lifetime.

"Q. Now, Mr. Houck, what did you do in the way of providing for them and performing your part of the contract?

"A. I done the best I could.

"Q. Well, go ahead and tell the court in a general way about that.

"A. I provided for the house in every way.

"Q. State whether or not you furnished them the necessaries of life there.

"A. Yes, I did. I always furnished the table.

"Q. Now who—where did you live after that contract was made?

"A. Lived on the home ranch.

"Q. Right on this ranch which was the property in controversy now?

"A. Yes, except about six months I went away to work one time.

"Q. Now, where did your mother and father live thereafter?

"A. They lived at the home ranch.

"Q. In the same house with you?

"A. Yes, sir.

"Q. How long did your father live after this transaction was entered into?

"A. About thirteen months."

93 Or.—19

The evidence shows that his mother continued to live with him until 1916, when she left, and that the occasion of her leaving was the service of the summons in this suit. The plaintiff's further testimony follows:

"Q. I will ask you to state whether or not your mother before you commenced this suit, whether or not she repudiated this deal that you had made.

"A. Yes, she did.

"Q. Was that in personal conversation with you or otherwise?

"A. In personal conversation.

"Q. Go ahead and state what she said now about it.

"A. Well, at different times she ordered me away.

"Q. And what was said about carrying out the contract so far as she was concerned?

"A. There was nothing said about that.

"Q. You mean she ordered you off the place at different times?

"A. Yes. * *

"Q. And who was at home at the time you got home, who was making the home there?

"A. My brother George had the place rented.

"Q. How long before that had you discussed the matter of deeding you the premises together with the contract to take care of your father and mother?

"A. Never discussed it at all.

"Q. Had you ever discussed it with any of the members of the family?

"A. No, sir.

"Q. Had you broached the subject at all to your mother and father?

"A. No, sir.

"Q. You remember this Mr. Austin was your attorney, was he?

"A. He drew up the contract and deed.

"Q. Was he your attorney, did you hire him?

"A. I paid him.

"Q. What was said, who broached the subject of deeding this land to yourself, your mother and your father, or yourself?

"A. They had me come from Nevada, that is the promise they made me, if I would come back and take care of them they would deed me the ranch.

"Q. Who made you the promise?

"A. My mother and oldest brother, * * David Elwood."

He also testified that his father was an old man, in poor health. In regard to caring for his parents, he said:

"Q. What do you mean, was that all there was to it, just that you should take care of them?

"A. And for the consideration—the consideration in the contract was that I should have the property.

"Q. And in case you didn't take care of them or didn't look after them, then the property was to go back to them?

"A. Why, I suppose so.

"Q. Is that the idea?

"A. Yes, sir. I suppose that is what the contract was for. * *

"Q. Who, did you say, had the running of the ranch at that time?

"A. My brother George.

"Q. How long was his lease, when did his lease expire?

"A. He had the ranch for five years, he had four years more.

"Q. And did you make any objection to this lease?

"A. No, I didn't.

"Q. You didn't make any objection to it?

"A. Only that he was to furnish their table, that is what they told me, I never saw the lease, and they claimed he was to furnish their table and he did not do it and that is all the objections I made.

"Q. What did you do towards taking care of your father and mother from that time on?

"A. I provided the table and the house."

He also testified that his mother went to Portland in 1911 and was gone about eleven months and that he gave her fifteen dollars when she left and sent her twenty dollars when she was coming home. Regarding any advances of money made to him by his mother, he testified on cross-examination as follows:

"Q. Have you ever repaid your mother for any of these advances she has made to you?

"A. She only made one, twenty dollars.

"Q. That is all she ever made to you?

"A. Yes, sir.

"Q. Did you ever repay her for the thirty dollars, or for the tombstone that she put up at your father's grave?

"A. No, sir.

"Q. And you never offered to repay the boy that took care of her in 1910 when you were away, you have never offered to repay them, have you?

"A. They have never asked me for anything. * *

"Q. How long did Robert live with the family after you went into possession of the premises?

"A. He has been there until last spring.

"Q. Well, if you did, when you did leave the ranch who was there to take care of your mother?

"A. Well, Robert was there when I was away, he stayed there all of the time."

When the defendant Hilla A. C. Houck was seriously ill in 1914, Dr. Dickson was called from Kerby to attend her and the plaintiff testifies that his mother paid the doctor's bill. In answer to the question, "Did she ever complain of any lack of attention?" he said, "Oh, yes, she was always complaining."

With reference to his brother George's lease, the plaintiff testified:

"A. He rented it in 1906 for five years and he had it four years.

"Q. Then you went back to Nevada in '10, didn't you?

"A. Yes, sir.

"Q. So you didn't take possession of the place until you got back from Nevada, did you, Mr. Houck?

"A. Well, I was there all of the time.

"Q. And you say your brother had it leased until 1910?

"A. Yes, sir.

"Q. He run the ranch there?

"A. He run the ranch there, yes, sir.

"Q. So you were not in possession of the ranch at that time, were you?

"A. No, sir. That is, I didn't run the ranch."

Concerning the deed and contract, Mrs. Isabel Austin testified thus:

"The agreement was, as nearly as I can remember, a contract on the part of J. G. Houck to care for his father and mother during their lifetime, while they agreed that he was to have the home farm and certain stock, I believe, in return therefor. * * The original of the agreement was delivered, after being duly signed, to David Houck and Hilla Houck. The copy or duplicate was, I think, given to J. G. Houck."

She stated, also, that she witnessed the execution of the papers.

J. H. Austin testified that he was by occupation an attorney, then residing at Kerby, Oregon, and that:

"I drew up a deed for David Houck and his wife, Hilla A. C. Houck, in which they deeded their farm on which they were living at that time to their son, J. G. Houck. I also at the same time drew up an agreement between the said David Houck, Hilla A. C. Houck and J. G. Houck. In this agreement, it was agreed between J. G. Houck, their son, and David Houck, his father, and Hilla A. C. Houck, his mother, that for the consideration of the said deed the said J. G. Houck should take care of the said David Houck and Hilla A. C. Houck during the remainder of their lives."

The witness stated that he prepared both papers according to the instructions of the plaintiff's parents

and that the same were duly signed, witnessed and acknowledged. Regarding the delivery of the papers, he said:

"The deed * * was delivered to J. G. Houck by David Houck in my presence and I think in the presence of Cy Ducommun and Mrs. Isabel Austin and Hilla A. C. Houck. I remember telling J. G. Houck he should have it recorded, and he said something about doing so and handed the deed to his mother."

Cy Ducommun, a witness for the defendants, testified that he was not in Oregon, but in the State of Nevada, at the time of the alleged transaction and that he did not witness either the alleged deed or contract.

The defendant Hilla A. C. Houck denied the execution of the alleged deed or contract and gave testimony tending to show that no deed was ever executed by either herself or her husband, and that the contract was the one set forth and alleged in the answer, by which she, only, agreed that if the plaintiff would care for and support his parents during the remainder of their lives, in consideration thereof she would convey to him her undivided half interest in the land, to take effect at her death, pending which the plaintiff should have possession of the same. She further testified:

"Q. What was done with the contract or the instruments that were signed, after they were signed?
"A. Mr. Austin turned and handed it to me.
"Q. What did you do with it?
"A. I took it and put it away.
"Q. How long did you have the custody of that?
"A. Well, I had it from the time it was signed in— along in April, 1907—until the time that I started for Portland in 1909 or '10. * *
"Q. What did that contract provide for?

"A. It provided for him to take care of me, do for me kindly and lovingly. * *

"A. I says, 'Well, what will be done with this?' Now I am going to use his [plaintiff's] language. He says, 'I don't care what in hell becomes of it if I had my seven dollars and a half back, I don't care if the ranch went to hell,' was his language that he used to me. * * That was right there within fifteen minutes after they drove away with the buggy—in the buggy.

"Q. Jacob Houck, then, never had this contract in his possession?

"A. He never had it right then. Then and there when he used that language to me, thinks I, 'Old boy, I will watch you for awhile before this goes on record.' From day to day things went a little more and a little more until I could not put up with it."

The above is substantially all of the testimony concerning the execution of the deed and contract and the delivery and custody thereof.

This is a transaction between aged and infirm parents on one side and their twenty-six year old son on the other, wherein the papers were prepared and acknowledged by an attorney employed and paid by the son. Neither of the other heirs was present at the time or had any exact knowledge that the papers were executed. Robert Houck, a brother of the plaintiff, was then living on the farm and George Houck, another brother, had it leased at that time. Yet, according to the plaintiff's own testimony, they were not consulted and did not know anything about the transaction. There is no evidence of any friction between the parents and any of their children, that they had any preference for one over the others or that there was any reason for preference.

Assuming that the plaintiff's testimony is true and that he kept and performed his alleged agreement, the old folks received nothing more therefrom than the

privilege of continuing to reside where they had lived for thirty-nine years, and to have the simple necessaries of life furnished them, in consideration of which the plaintiff then received a fee-simple title to and the use and enjoyment of their old home, which was of the reasonable value of $10,000 to $12,000. Outside of their actual household expenses, there is no evidence that the plaintiff furnished his parents money in excess of $100 for the nine years, and there is evidence that during that period they paid out more than that amount on the maintenance and upkeep of the farm.

It must be conceded that as owners in fee simple, the parents had a legal right to dispose of their property by deed or will, in their own discretion. But this is a suit to enforce a deed founded upon a contract. The plaintiff testified that there was a contract; that it was pinned to the deed and that together the instruments were delivered to his mother. According to his own statements, the matter was never mentioned or discussed between them thereafter, and he was advised in 1913 that his mother had destroyed the papers. He was told by his attorney to have the deed recorded, and the only reason which he assigns for not having done so, is the statement, "I just neglected it." He further testified that he never saw the instruments after they were left with his mother for safekeeping. and that he never tried "to get the papers afterwards for recording."

R. P. George, a land owner and neighbor of the Houcks, testified that at the time the disputed property was leased by George Houck it had an annual rental value of $300 to $400, and there is testimony tending to show that it yielded at least ninety tons of

hay yearly; that it had a good water right and that the cultivated land was very productive.

1. Under all of the facts and surrounding circumstances, we think that it was not the purpose or intent of the plaintiff's parents in April, 1907, to deliver the deed or part with the title to their property. According to the plaintiff's testimony, the contract was pinned to the deed and was the consideration therefor. He also stated that if he did not take care of his parents the property was to go back to them, and that, "I suppose that is what the contract was for."

2. As to delivery, the law is well stated in *Hill* v. *Kreiger*, 250 Ill. 408 (95 N. E. 468):

"In the case of an ordinary deed of bargain and sale it is indispensable, whatever means may be adopted to accomplish its delivery, that the deed passes beyond the dominion and control of the grantor, since both the grantor and the grantee cannot have control of the deed at the same time."

13 Cyc. 562, 563, says:

"It is a general rule, subject to certain exceptions herein given that a delivery of a deed to be valid must be such as deprives the grantor of the possession and of the control of the instrument. * * It does not necessarily follow from the fact that the grantee has possession of the deed that there has been a delivery of the instrument, for it may have come into his hands without any intent on the part of the grantor to make a delivery."

8 R. C. L. states the rule thus:

"Delivery is essential to the validity of a deed. It is the final act which consummates the deed, is as necessary as the seal or signature of the grantor, and without it all other formalities are ineffectual and the deed is void *ab initio*, being at most a mere proposition to convey, which may be withdrawn at any time before acceptance by the other party. Delivery has been called the life of a deed" (page 973).

"While delivery may be by words or acts, or both combined, and manual transmission of the deed from the grantor to the grantee is not required, it is an indispensable feature of every delivery of a deed, whether absolute or conditional, that there be a parting with the possession of it and with all power and control over it, by the grantor, for the benefit of the grantee, at the time of the delivery. * * In other words, delivery may be effected by any act or word manifesting an unequivocal intention to surrender the instrument so as to deprive the grantor of all authority over it or the right of recalling it; but if he does not evidence an intention to part presently and unconditionally with the deed, there is no delivery" (page 985).

3. The burden of proof was upon the plaintiff. He was dealing with his aged and infirm parents. The deed and contract were prepared by an attorney employed and paid by him, and by his own testimony it was an unconscionable and unreasonable agreement, by which his parents were then to part with the title to all their property, in consideration of which he was to provide "the house and the table." The house was their old home and the table was largely supplied with the products of the farm. There are strong reasons for holding that this is an instance in which the parents should have had independent advice in the preparation and execution of the deed and contract. There was nothing but a nominal consideration to support the conveyance of their property, which was of the reasonable value of at least $10,000.

4. We hold that there was no delivery of the deed and that upon the record before us the plaintiff does not have any standing in a court of equity.

The decree is reversed and the suit dismissed.

REVERSED AND SUIT DISMISSED.   REHEARING DENIED.

MCBRIDE, C. J., and BEAN and BENNETT, JJ., concur.